

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 3, 2026

**BY ECF AND EMAIL**
The Honorable Jennifer L. Rochon
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

The Honorable Gabriel W. Gorenstein
United States Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

   Re: *United States v. Ahuva Katzin and Yitzchok Sklar*, 26 Cr. 24 (JLR)

Dear Judge Rochon and Judge Gorenstein:

  In advance of the presentments that are expected to occur later today or tomorrow, the Government respectfully submits this letter to provide the Court and defense counsel with a summary of the charges unsealed today in the above-captioned case and the basis for the Government's motion for pretrial detention of defendants Ahuva Katzin and Yitzchok Sklar, a/k/a "Isak Sklar."

  Between 2023 and 2025, Katzin and Sklar participated in a narcotics conspiracy that caused the death of Sklar's four-year-old son (the "Victim") from exposure to fentanyl on March 4, 2025. Katzin, who was released on bail at the time for New York State narcotics charges, had supplied the lethal fentanyl to Sklar on March 3. On the morning of the Victim's death, after Sklar knew that the Victim was in a medical emergency, and before first responders arrived at the apartment to treat the Victim, Sklar ran out of the apartment with a bag of his drugs and placed them in his nearby rental car. In the months following the Victim's death, Katzin and Sklar continued to work together to distribute narcotics unabated throughout New York. As a result of their crimes, Katzin and Sklar are charged with conspiracy to distribute narcotics resulting in death, which carries a mandatory minimum term of imprisonment of 20 years and a maximum term of life imprisonment. Because of the defendants' severe danger to the community and their proven risk of flight, the Government respectfully requests that the Court order them detained pending trial.

I. **Applicable Law**

A defendant must be detained where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In making this determination, the Court must consider:

(1) the nature and circumstances of the offense charged, including whether the offense . . . involves a minor victim or a controlled substance;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—;

  (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

  (B) whether at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C § 3142(g).

Where, as here, there is probable cause to believe that the defendant committed an offense under the Controlled Substances Act for which the maximum term of imprisonment is ten years or more, subject to rebuttal by the defendant, "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of the community." 18 U.S.C § 3142(e)(3)(A). The presumption of remand "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). The defendant "bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011). "[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). Even when a defendant "has met his burden of production" to rebut the presumption favoring detention, that presumption "does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

"At all times, however, 'the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community,' and 'by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight.'" *United*

*States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *Mercedes*, 254 F.3d at 436). For purposes of the bail statute, the concept of dangerousness includes "the danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993).

## II. The Defendants Should be Detained

The facts described below come from, among other sources, New York City Police Department ("NYPD") reports, information provided by the New York City Office of the Chief Medical Examiner ("OCME"), criminal history records, surveillance video, records and communications obtained from judicially-authorized search warrants for electronic devices and iCloud accounts, and anticipated witness testimony.

### a. Ahuva Katzin

Katzin ran an operation to sell fentanyl, methamphetamine, and heroin to customers throughout New York City, including in Brooklyn, Manhattan, and the Bronx. Katzin supervised several other workers, including Sklar, in connection with her drug-selling operation. Katzin's iCloud backup of data from her cellphone contains countless communications with drug customers and workers regarding drug transactions, as well as numerous photographs of narcotics, examples of which are depicted below:

  

Prior to the instant arrest, Katzin had three narcotics-related arrests in New York State in the past three and a half years: (i) a November 2022 arrest, which resulted in a misdemeanor plea to operating a motor vehicle while impaired by drugs, in satisfaction of charges that included fourth degree criminal possession of a controlled substance and fourth degree criminal possession of a weapon; (ii) a September 2024 arrest on charges that included third degree possession of a controlled substance with intent to sell, which charges remain pending; and (iii) a November 2024 arrest on charges that included second degree criminal possession of a controlled substance and third degree possession of a controlled substance with intent to sell, which charges also remain pending. A bench warrant for Katzin was issued on December 9, 2025 in connection with the

charges stemming from her September 2024 and November 2024 arrests. Katzin also has a 2020 conviction for driving while impaired by alcohol, in satisfaction of charges that included fifth degree criminal possession of a controlled substance and attempted tampering with physical evidence. Two bench warrants for Katzin were also issued in connection with that case.

None of these arrests deterred Katzin in the slightest. Katzin resumed dealing drugs immediately following her November 2024 New York State arrest. For example in a December 2, 2024 text message exchange with a drug customer, Katzin coordinated a drug transaction and advised the customer to "be careful" because she "just got arrested and came out after being a week locked away."[1]

### b. Yitzchok Sklar

Sklar assisted Katzin by, among other things, driving Katzin and other members of the drug-selling operation to make drug deliveries, personally making drug deliveries for Katzin, and accepting and transmitting payment on behalf of Katzin to facilitate drug transactions. For example, on February 10, 2025, Katzin sent Sklar a text message asking if Sklar wanted to drive another co-conspirator "to make a few deliveries," to which Sklar responded, "Yeah absolutely can I come through now." A few days later, Sklar wrote to Katzin, "if you need me to make any runs I'm around." As discussed below, Sklar also received narcotics from Katzin for distribution to the Victim's mother and for his personal use.

Sklar's New York State criminal history includes: (i) a 2015 conviction for driving while impaired by alcohol (the "2015 DWI"); (ii) a 2016 conviction for operation of a motor vehicle while impaired by drugs (the "2016 DWI"); a 2016 conviction for second degree possession of a forged instrument, for which Sklar was sentenced in 2017 to an indeterminate term of one to three years' imprisonment; and a 2019 conviction for third degree aggravated unlicensed operation of a motor vehicle. Bench warrants for Sklar were issued in connection with the 2015 and 2016 DWIs. Sklar has open charges in Kings County Criminal Court for endangering the welfare of a child and seventh degree criminal possession of a controlled substance stemming from his role in the Victim's death.

### c. Katzin Provides Fentanyl to Sklar on March 3, 2025

At the time of the Victim's death in March 2025, Sklar was living with the Victim and the Victim's mother at a shelter apartment in Brooklyn.

Sklar regularly purchased fentanyl, which he commonly referred to as a "rock," from Katzin, including on the day before the Victim's death. On the morning of March 3, 2025, Sklar sent the following text message to Katzin: "Are you around I need the regular." At approximately 3:20 p.m., Katzin and Sklar spoke on the phone for approximately 75 seconds. At approximately

---

[1] In 2025, following the Victim's death, Katzin demonstrated a similar degree of sophistication and circumspection in detecting and rejecting efforts by law enforcement to make undercover narcotics purchases from her.

4:20 p.m., Sklar wrote to Katzin, "W[here] y[ou] a[t]."

Cell site records for Sklar's and Katzin's phones then show that between approximately 4:40 PM and 5:00 p.m., Sklar traveled from the shelter to the vicinity of Katzin's residence, where Katzin was located at that time. At approximately 4:57 p.m., Katzin and Sklar spoke on the phone again for approximately 37 seconds. At around that same time, a Zelle account in the name of a company registered in the name of Sklar's father sent $50 to Katzin's account.

At approximately 6:56 p.m., Sklar texted the Victim's mother, "Just grabbed the rock as well where are you." Sklar and Katzin spoke on the phone approximately six more times between 6:00 p.m. and 11:00 p.m.

At approximately 3:14 a.m. on March 4—just over four hours before the medical emergency that led to the Victim's death—the Victim's mother sent a message to Sklar asking where the "rock" was, and Sklar responded, "Sorry coming up."

### d. The Victim's Medical Emergency and Death on March 4, 2025

At approximately 7:19 a.m. on March 4, 2025, Sklar called a volunteer emergency medical service to report that the Victim was foaming at the mouth and making unusual noises. Shortly after the call ended, and moments before first responders arrived, Sklar was captured on video surveillance footage rushing out of the shelter to hide a black bag. A video of Sklar (i) entering the elevator of the shelter with the bag, (ii) running out of the shelter with the bag, and (iii) returning to the shelter empty-handed a few moments later is attached hereto as Exhibit A, and a still image of Sklar entering the elevator of the shelter with the bag is below:



Emergency medical personnel arrived and administered medical treatment to the Victim, who was unresponsive and experiencing symptoms consistent with an opioid overdose. The Victim's mother told a responding EMT that there was fentanyl inside the family's apartment. When the EMT asked whether the fentanyl was in pill or powder form, Sklar responded, in sum and substance: "It's a rock."

The bag that Sklar attempted to conceal was later recovered from a nearby BMW X5 SUV rented by Sklar, and found to contain, among other things, substances testing positive for fentanyl, para-fluorofentanyl, and heroin. A photograph of the bag inside the BMW is below:



Law enforcement officers also searched the family's apartment inside the shelter and found, among other things, bongs on the kitchen counter of the apartment containing substances that tested positive for fentanyl, among other substances.

The Victim was taken to Maimonides Hospital and later transferred to Long Island Jewish Medical Center ("LIJMC"). At approximately 5:58 p.m., the Victim was pronounced dead at LIJMC. A medical examiner with the OCME subsequently determined that fentanyl (including fluorofentanyl) caused the Victim's death.

### e. Katzin and Sklar Knew That Their Distribution of Drugs Had Caused the Victim's Death Yet Continued to Deal Drugs

Following the Victim's death, Katzin and Sklar demonstrated knowledge of the possibility that their drug dealing had caused the Victim's death. On March 8, 2025, Katzin wrote to another individual that the "family" was saying it was "respiratory infection, but the news is saying fentanyl." Katzin then wrote that she had been trying to "be there" for Sklar but that she was "also a little spooked if you know what I'm talking about." On March 10, 2025, Katzin wrote to a second individual, "Did you read the article where they said he was asked what kind of fentanyl and he said rock[?]" On March 13, 2025, Katzin wrote to Sklar, "I was trying to say one thing to you, but you kept talking. The main thing that the lawyer said was whatever you do don't talk to anyone about anything about the case. Nobody not on the phone not in person." Sklar later responded: "You absolutely right and I am very careful with my words and I'll be extra careful and that's what I meant when I kept texting you earlier stop texting me stop texting everyone stop talking. It's worthless less everybody knows the better everybody wouldn't talk. Shit it'll be a lot less problems in this world."

Katzin nonetheless continued her extensive drug dealing, as reflected in numerous text messages with co-conspirators and drug customers preserved in her iCloud accounts.

Sklar himself continued to participate in Katzin's drug-selling operation, despite knowing that it had led to his child's death. For example, on April 28, 2025, after a customer had asked Katzin for "4 buns: 2 brown . . . 1 name print . . . 1white"—terms that refer to "bundles" of baggies of drugs—Katzin responded that she was sending Sklar to make the delivery and wrote, "He's the guy who's kid died . . . So just don't mention anything extra to him pls."

Katzin and Sklar were arrested today, February 3, 2026. Law enforcement officers searched Katzin's Brooklyn apartment pursuant to a warrant and recovered, among other things: solid white substances (top left); pills alongside multiple clear plastic baggies (top right); and large quantities of colored plastic baggies (bottom left) and glassine envelopes (bottom right), depicted in the photographs below.






\*   \*   \*

For the reasons set forth above, each of the Section 3142(g) factors weighs heavily in favor of detention. *First*, the nature and circumstances of the defendants' offense—an offense involving the distribution of lethal quantities of narcotics, including fentanyl, that caused the death of a child—demonstrates that the defendants pose a significant danger to the community. *Second*, the weight of the evidence against each of the defendants is overwhelming. In combination with the

Page 8

20-year mandatory minimum that applies to the charged offense, the strength of the evidence creates a strong incentive for the defendants not to appear to face the charges against them, and to tamper with or conceal evidence, as Sklar sought to do in this very case as his son was dying from fentanyl exposure. *Third*, each of the defendants' histories and characteristics demonstrates that they are likely to continue to dealing drugs and/or flee if released on bail: the defendants each have multiple prior arrests and criminal convictions, some of which cases required the issuance of bench warrants; each continued dealing drugs after knowing that their drug dealing had caused the Victim's death; and, as to Katzin, her commission of the instant offense took place while she was released pending trial in connection with New York State controlled substance offenses.

Accordingly, in light of the danger to the community and risk of flight posed by both Katzin and Sklar, the Government respectfully submits that the defendants must be detained pending trial.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____

Meredith Foster
Henry L. Ross
Assistant United States Attorneys
Tel: (212) 637-2310 / -2442

cc:   All Counsel of Record (by ECF and Email)